In re TRIM–LEAN MEAT PRODUCTS, INC., a Delaware Corporation, Debtor.

TRIM CUT COMPANY, INC., a Delaware Corporation, Plaintiff,

v.

Warren F. BEASLEY, Trustee of Trim-Lean Meat Products, Inc., Defendant.

No. 79–234.  Adversary No. A–79–6.

United States Bankruptcy Court, D. Delaware.

May 13, 1980.

Morris, James, Hitchens & Williams, Eduard F. von Wettberg, III, P. Clarkson Collins, Jr., Wilmington, Del., for defendant, trustee Warren F. Beasley.

Knecht, Greenstein, Schagrin & Berkowitz, Robert Burton Coonin, Gerald Z. Berkowitz, Wilmington, Del., for plaintiff Trim Cut Company, Inc.

## MEMORANDUM OPINION

BALICK, Bankruptcy Judge.

Trim-Lean Meat Products, Inc. ("Trim-Lean") is in a reorganization proceeding under Chapter 11 of title 11 U.S.C. On November 1, 1979, Trim Cut Company, Inc. ("Trim Cut") filed a motion pursuant to 11 U.S.C. § 365(d)(2) seeking an order directing the trustee to either assume or reject the unexpired portion of a lease agreement between Trim Cut and Trim-Lean at a time different from the date of confirmation of a plan. The trustee filed an answer asserting certain defenses and a counterclaim, which was subsequently amended by stipulation and order. The counterclaim charges Trim Cut with wilful appropriation of Trim-

Lean's corporate opportunity, that is, the trustee seeks to have Trim Cut declared a constructive trustee of a lease and purchase option for the benefit of Trim-Lean. Trial was held March 3 and 4; argument April 21, 1980.

The court will use the same abbreviations and references to principals as that used by counsel for the parties in their briefs.

Abbreviations:

| | |
|---|---|
| T(I) | Trial Transcript, March 3, 1980 |
| T(II) | Trial Transcript, March 4, 1980 |
| PX | Trial Exhibits |

Principals:

*Robert W. and Phyllis M. Wynn* (the "Wynns")—present owners and lessors of premises situated in the Diamond State Industrial Park at 575 Bellevue Road in Newark, Delaware (the "premises"). [T(I)4; T(I)5; PX 10].

*Adriatic Associates*—A Delaware partnership and former owner and lessor of premises. [PX 1].

*Trim Cut Company, Inc.* ("Trim Cut")—a corporation of which Jan Berkowitz, his wife Cynthia Berkowitz, Leonard Berkowitz, his wife Shari Berkowitz, and perhaps also Samuel Berkowitz, Jan's father, are stockholders. Jan and Leonard Berkowitz are the dominating and controlling stockholders. [T(I) 1–3].

*Trim-Lean Meat Products, Inc.* ("Trim-Lean")—the debtor, a corporation of which Jan Berkowitz, Leonard Berkowitz and David Gilbert each own 33⅓% of the outstanding stock. [T(II)69]. Jan Berkowitz is the president. [T(II)3].

*Trim Cut Distributing Co., Inc.* ("Trim Cut Distributing")—a corporation of which Jan Berkowitz was the president and a 65% stockholder. Mitchell Berkowitz, Jan's brother, was the vice president and 35% stockholder. [T(II)7–8]. It went into involuntary bankruptcy in May, 1979. [T(II)10].

*Trim Cut Processing Company* ("Trim Cut Processing")—a corporation of which Jan Berkowitz was the president and sole stockholder. [T(II)8].

In 1977, Trim Cut began leasing the premises from Adriatic Associates. [PX 1].

Adriatic also gave to Trim Cut in connection with the lease an option to purchase the premises at fixed sums of money beginning in December of 1979. [PX 1]. During 1977, 1978 and early 1979, Trim Cut in turn purportedly orally leased the premises to Trim Cut Distributing and Trim Cut Processing for their operational use in the ham boning business. [T(II)12]. However, neither Trim Cut Processing nor Trim Cut Distributing ever paid rental to Trim Cut. They paid directly to Adriatic Associates Trim Cut's rental payment of $2,010 under the lease. [T(I)12–16; PX 1].

In approximately January of 1979 those individuals who eventually became the principals of Trim-Lean began to make physical improvements to the premises with the view toward setting up the ham processing business which would eventually become Trim-Lean. [T(I)55–56; T(II)4–5]. Plumbing and contracting work and other improvements were billed to and performed on the credit of Trim-Lean. [T(I)125–126].

On February 28, 1979, Trim Cut exercised its option to purchase the premises from Adriatic for $190,000.00. [PX 2]. Also on February 28, Trim Cut entered into a letter of intent with Robert Wynn to sell the property to Wynn for $290,000.00. In the letter of intent, the sale was subject to the execution of an acceptable lease. It was not specified to whom the lease would run. [PX 3].

On March 1, 1979, Jan Berkowitz for Trim Cut and the Wynns executed a sales agreement in which Trim Cut agreed to sell and the Wynns agreed to buy the premises for $290,000.00. [PX 4]. Final settlement was to be held on April 20, 1979. [PX 4]. The contract of sale contained certain contingencies. The pertinent contingencies were (1) that the Wynns' obligation to purchase was contingent upon their obtaining financing on certain specific terms and (2) the sale was contingent upon creation of a "lease agreement satisfactory to the parties." [PX 4]. Sometime in April it became clear to all involved that the Wynns could not satisfy the mortgage contingency

under the agreement of sale because they were unable to obtain the required financing. [T(I)27]. Although this relieved the Wynns from their obligation to purchase under the sales contract, negotiations continued. [T(I)28]. Jan Berkowitz on behalf of Trim Cut permitted new financing terms for the Wynns with an increase in rental from that originally contained in the letter of intent.

Trim-Lean was incorporated on March 20, 1979. [T(I)53]. During March, April, and May, Trim-Lean began receiving equipment for its operation. It began production on approximately May 15–17. In April and May, Trim Cut borrowed $50,000.00 from Delaware Trust Company. These funds were used in part to pay creditors of Trim Cut Distributing and in part loaned to Trim-Lean. There is no written evidence to support this distribution.

On May 30, 1979, there was a closing on the sale of the premises by Adriatic. However, in an effort to avoid payment of two transfer taxes Trim Cut assigned its option with Adriatic to the Wynns for $100,000.00. [PX 1]. Also on May 30 the Wynns and Trim Cut executed a lease giving Trim Cut another option to purchase. [PX 10]. Thereafter, Trim Cut executed a sublease with Trim-Lean. [PX 12, 13]. The sublease did not include an option for Trim-Lean to purchase, and the sublease called for Trim-Lean to pay Trim Cut a rental greater than Trim Cut was obliged to pay the Wynns. [PX 10, 12, 13; T(II)77, 78]. An addendum to lease dated July 25, 1979 prepared by Jan Berkowitz raised the rent due Trim Cut from Trim-Lean after a grace period. [PX 14].

On April 20, 1979, Trim-Lean paid by check the rent Trim Cut then owed Adriatic. [PX 16; T(I)19–20]. On June 8, 1979, Trim-Lean paid by check the rent Trim Cut owed Adriatic for the period May 1 through May 30, 1979. [PX 18; T(I)20]. Trim-Lean's funds were used to satisfy Trim Cut's obligation to Adriatic for satisfaction of a capital gains penalty necessitated by Trim Cut's desire to exercise the Adriatic purchase option prior to December 1, 1979,

thereby enabling it to assign the purchase option to Wynn. [T(II)40, 41, 46]. Also, Trim Cut secured part of its obligation to Adriatic for Adriatic's capital gains penalty with equipment and assets belonging to Trim-Lean. [PX 19; T(II)46]. Finally, Trim-Lean satisfied rental obligations which Trim Cut owed to the Wynns for the months of June, July and August, 1979. [PX 17, 20, 21]. Although Trim Cut had a checking account, it has never written a check against it. [T(II)33]. In all, more than $19,000.00 of Trim-Lean's funds were used to satisfy those obligations of Trim Cut necessary to enable Trim Cut initially to acquire and then maintain in good standing the Wynn lease and purchase option.

The fundamental proposition upon which Trim-Lean relies to sustain its counterclaim is that a director of a corporation may not appropriate for himself a business opportunity that in all fairness should belong to his corporation. More specifically, where directors of a corporation, with the use of corporate funds, divert for their own personal profit a business opportunity in which by its nature the corporation has an expectancy and which would be of practical advantage to the corporation, such directors breach their fiduciary duties.

It is settled law in Delaware that corporate officers and directors are not permitted to use at the expense of the corporation their position of trust and confidence to further their private interests. *Guth v. Loft*, Del.Supr., 5 A.2d 503 (1939). Thus, a director's use of corporate funds to finance a business opportunity for his own benefit is prohibited. *Brown v. Dolese Bros. Co.*, 38 Del.Ch. 471, 154 A.2d 233 (1959) aff'd, Del. Supr., 157 A.2d 784 (1960); *Guth v. Loft, supra*. Grounded in this same fiduciary duty is the corollary "corporate opportunity rule" as stated in *Guth v. Loft, supra*.

"... [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an

interest or a reasonable expectancy, and by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself." *Id.* at 511.

It must be noted that the proscription against appropriation of corporate property for private gain is of broader application than the corporate opportunity rule. The latter is but a specialized application of the former. It essentially treats a corporation's expectations regarding certain business opportunities which are in the corporation's line of business and of practical advantage to it as corporate property which may not be appropriated for personal gain. On the other hand, the general proscription against misapplication of corporate funds applies equally to business opportunities outside the corporation's line of business. Thus, a business opportunity falling outside a corporation's line of business and which would not otherwise be considered a corporate opportunity, nevertheless, will be deemed a *corporate opportunity* if developed or financed with corporate funds. *Guth v. Loft, supra,* at 510–511. The law of corporate opportunity, grounded as it is in notions of fiduciary duty, is equally applicable to closely held corporations. *Brown v. Dolese Bros. Co., supra.* The basic question in all cases is whether the director has appropriated something for himself that, in all fairness, should belong to the corporation. *Equity Corp. v. Milton,* Del.Supr., 221 A.2d 494 (1966).

Jan and Leonard Berkowitz were officers, directors and, together, controlling stockholders of Trim-Lean. As such they owed Trim-Lean a fiduciary duty and are not permitted to use their position of trust and confidence to further their private interests. Yet, they did precisely that at the expense of Trim-Lean. The option to purchase the property from Wynn and the lease of the premises at a lower monthly rental than that provided in the purported Trim Cut/Trim-Lean sublease was a valuable business opportunity for Trim-Lean.

Trim-Lean, as an operating company in the meat processing business, required a suitable plant. Obviously Trim-Lean regarded these premises suitable and expended money to make necessary improvements to the premises before ever entering into a sublease with Trim Cut Company. The lease was needed to operate. Further, the purchase option was valuable to Trim-Lean as evidenced by Trim Cut's ability to assign to the Wynns for a price of $100,000.00 its purchase option under the earlier Adriatic lease. Despite the obvious practical advantage inuring to Trim-Lean from acquisition of such a lease, the Berkowitzes diverted the business opportunity to Trim Cut Company, a closely held corporation, of which they were the dominant controlling stockholders.

That the Berkowitzes were also directors and officers of Trim Cut and owed that company a fiduciary duty or the fact that Trim-Lean was not formally incorporated until March 20, 1979 provides no justification for their conduct.

The record is clear that in January 1979, the Berkowitzes intended to form Trim-Lean for the full processing of ham and undertook to establish it. From that time forward, they stood in a fiduciary relationship to Trim-Lean. *Bovay v. H. M. Bylesby & Co.,* 25 Del.Ch. 1, 12 A.2d 178 (1940). Thus, the Berkowitzes had a duty to act in good faith to both corporations. Their direction of the business opportunity to Trim Cut rather than Trim-Lean does not meet a good faith fairness test.

First, they never presented Trim-Lean with the business opportunity. Although Jan Berkowitz was first presented with the opportunity to enter into a sale-lease-back/purchase option transaction with the Wynns on or about February 28, Trim Cut did not acquire the lease and purchase option until May 30, 1979. This was nearly 1½ months after Trim-Lean had been incorporated. Even the contract of sale between Wynn and Trim Cut contemplated a closing date and actual acquisition of the business opportunity a full month after Trim-Lean was incorporated. However no significance can be given to February 28 and March 1 with respect to when the business opportu-

nity arose. As late as April and after Trim-Lean was incorporated, Wynn learned he was unable to satisfy the financing contingency and was no longer bound by the March 1 contract of sale. Consequently, it was after Trim-Lean was incorporated that Trim Cut renegotiated the terms of the Wynn transaction and became legally bound.

Moreover, prior to the time the Wynns and Trim Cut signed a letter of intent and entered into a contract of sale, those individuals who eventually became principals of Trim-Lean began to improve the plant and premises with a view toward setting up the business which would eventually become Trim-Lean. Thus, even on February 28, and March 1, 1979, the Berkowitzes contemplated acquisition of the Wynn business opportunity entirely through the operating revenues of Trim-Lean. In short, the Berkowitzes did not acquire practically or legally the Wynn business opportunity until after Trim-Lean had been formed. Despite this fact, the Berkowitzes never presented the opportunity to Trim-Lean even though they knew of its crucial importance to the Trim-Lean operation. Instead, they diverted the opportunity to their own corporation, Trim Cut. Significantly, the Berkowitzes admit they sought a "corporate advantage" [T(I)132] or "profit" [T(I)88–90] for Trim Cut at the expense of Trim-Lean. This, coupled with the fact that Trim Cut could only finance the Wynn lease and purchase option at the expense of and with Trim-Lean revenues constitutes a breach of the fiduciary duties the Berkowitzes owed to Trim-Lean.

■ Second, even if the Berkowitzes breached no fiduciary duty in directing the Wynn business opportunity to Trim Cut, use of Trim-Lean's assets to promote and develop the business opportunity for Trim Cut, standing alone, requires that Trim Cut hold the opportunity in trust for the benefit of Trim-Lean. For Trim Cut to be in a position to assign its purchase option with Adriatic to Wynn and in turn take back a lease and purchase option from Wynn, it was necessary that Trim Cut be in good standing under its Adriatic lease. Trim Cut accomplished this by using Trim-Lean's funds to pay the rent Trim Cut owed to Adriatic for April and May, 1979. In addition, Trim-Lean's funds were used to satisfy Trim Cut's obligation to Adriatic for satisfaction of Adriatic's capital gain penalty. This too was required of Trim Cut to allow premature exercise of the Adriatic purchase option thereby permitting assignment of its Adriatic purchase option to the Wynns. In connection with this obligation, Trim Cut secured part of its obligation to Adriatic with equipment and assets belonging to Trim-Lean. Finally, Trim-Lean satisfied any rental obligation which Trim Cut purportedly owed to the Wynns for the months of June, July, and August, 1979. In all, more than $19,000.00 of Trim-Lean funds were used to satisfy those obligations of Trim Cut necessary to enable Trim Cut initially to acquire and then maintain in good standing the Wynn lease and purchase option.

■ Such conduct constitutes a breach of the Berkowitz's fiduciary duties as officers and directors of Trim-Lean. Trim Cut is estopped from denying that this business opportunity, acquired with the corporate assets of Trim-Lean, is a corporate opportunity belonging to Trim-Lean. Thus, Trim Cut is a constructive trustee and holds the Wynn lease and purchase option for the benefit of Trim-Lean.